# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## COLUMBIA DIVISION

| | | |
|---|---|---|
| **TERRY WYNN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:11-0025** |
| | ) | **Judge Sharp** |
| **CITY OF PULASKI, TENNESSEE;** | ) | |
| **OFFICER CHAD ESTES, in his** | ) | |
| **individual and official capacities;** | ) | |
| **SERGEANT JUSTIN YOUNG, in his** | ) | |
| **individual and official capacities;** | ) | |
| **OFFICERS #1-#20, in their official and** | ) | |
| **individual capacities,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

En route to deliver a baby at a nearby hospital, Plaintiff Terry Wynn, a physician, was stopped by a City of Pulaski, Tennessee police officer and subsequently arrested. What did or did not prompt the stop, and what happened thereafter, serve as the basis for this civil rights action.

The Defendants include not only the arresting officer, Chad Estes, but also his supervisor, Sergeant Justin Young, twenty unidentified "John Doe" Defendants, and their employer, the City of Pulaski. Summary judgment motions have been filed on behalf of all Defendants (Docket Nos. 50, 56 & 58), and those motions have been fully briefed by the parties.

## I. FACTUAL BACKGROUND

The underlying facts in this case are hotly disputed. While the facts must be construed in Plaintiff's favor for purposes of the pending motions for summary judgment, in reciting the facts the Court sets forth Defendants' version of events so as to give some background to the legal arguments

1

presented.

Dr. Wynn is African American and has a gynecological and obstetrics practice in Pulaski. She also works as an on-call physician for Hillside Hospital which is down a walkway from her office.

At approximately 8:50 p.m., on May 5, 2010, Dr. Wynn received a call at her residence, instructing her that she was needed at the hospital. Specifically, she was informed that a patient was "complete" for delivery, which Dr. Wynn understood to mean that it was an emergency because the patient could deliver at any time.

In response, Dr. Wynn headed towards the hospital in her automobile which was plated with Michigan tags.[1] Nothing on the vehicle indicated that Dr. Wynn was a physician, or affiliated with Hillsdale Hospital.

As Dr. Wynn drove down First Street in Pulaski, she was passed by Officer Estes who was traveling in the opposite direction. At the time, Dr. Wynn had the vehicle's emergency flashers on.

Officer Estes claims that Dr. Wynn's vehicle was clocked by radar as going 46 miles-per-hour in a 30 miles-per-hour zone. He turned around and initiated a traffic stop.[2]

At 9:21 p.m., Officer Estes radioed dispatch, telling them he had stopped a vehicle with Michigan license plates. Officer Estes then approached the driver's side window of the vehicle and asked Dr. Wynn for her driver's license and proof of insurance. At the time, Dr. Wynn was dressed in hospital scrubs, and a lab coat was lying next to her in the passenger seat.

---

[1] Dr. Wynn moved from Detroit, Michigan to Pulaski in July or August 2009. At the time of the incident, she had not secured Tennessee tags or a Tennessee driver's license.

[2] Dr. Wynn believes she was traveling around 40 miles-per-hour, but concedes that she did not look at her speedometer.

Dr. Wynn told Officer Estes that she could not find her driver's license, and handed him hospital identification, but he said, "No, I need your driver's license." She then found her Michigan license and handed it to him.

Dr. Wynn claims that as Officer Estes was coming towards the driver's window, she waved at him to hurry up to the vehicle and told him, "I'm in a hurry," and "my patient is going to deliver," or words to that effect. She also told him that, if he did not believe her, he should follow her to the hospital and, if necessary, arrest her there.

Officer Estes claims that he told Dr. Wynn "that she wasn't free to go," and when Dr. Wynn took off (while he still had her license in his hand), he ran back to his vehicle, jumped in, and pursued her. For her part, Dr. Wynn does not recall what Officer Estes said. She does claim, however, that, after telling Officer Estes he could follow her to the hospital to sort things out, Officer Estes agreed and went back to his squad car, and Dr. Wynn resumed her trip to the hospital with Officer Estes following at a high rate of speed.[3]

At around 9:24 p.m. both vehicles arrived at the hospital, and Officer Estes, with the vehicle's lightbar activated, pulled in behind Dr. Wynn's car in the physician's parking lot. Here, again, the parties dispute what happened next.

Officer Estes claims he immediately got out of his car, went to Dr. Wynn's car, and, when the driver's door opened, told her she was under arrest. Officer Estes then asked Dr. Wynn to place her right hand behind her back and, when she did not comply, grabbed her left arm and placed a handcuff on it. He then used an "escort technique," whereby, with both of his hands on Dr. Wynn's cuffed left arm, he guided her to the front of his vehicle and forced her against the car so that he

---

[3]As Dr. Wynn pulled back onto the road, her tires "peppered rocks" on Officer Estes' vehicle.

could place the cuff on her right wrist.[4]

Dr. Wynn, however, remembers things quite differently. She recalls that when she arrived at the hospital, she immediately jumped out of her car and, without acknowledging Officer Estes, "rushed" towards the hospital's entrance. Officer Estes grabbed one of her wrists, "slung" a handcuff on it, and, in the process, cut her arm.[5] According to Dr. Wynn, Officer Estes then slammed her against the hood of his squad car, pressing her face, chest and waist onto the hood of the vehicle. Dr. Wynn was pressed up against the vehicle for maybe several minutes, during which time Officer Estes' crotch was in direct contact with her rear end or legs.[6] In the process of being cuffed and thrown up against the car, Dr. Wynn claims that her lower back was injured.

Once handcuffed, Dr. Wynn was instructed to get into the back of Officer Estes' squad car. Dr. Wynn claims not to have struggled or tried to physically resist Officer Estes' commands at this point, but admits that she did not get in willingly.

By the time Sgt. Young arrived on scene, Dr. Wynn was already handcuffed and being escorted to the back of Officer Estes' vehicle. Sgt. Young claims that Dr. Wynn was not complying with the instructions to get into the car, and so Officer Estes applied pressure to her shoulder to get her to comply. Once in the vehicle, Dr. Wynn complained to Sgt. Young that the handcuffs were too tight, but he ignored the complaint.

---

[4] A security guard at the hospital, Isaac Braden, testified at his deposition that he was standing at the ambulance bay entrance when Dr. Wynn was placed up against the front of the cruiser. He claims that he was unable to hear what exactly was said, but it looked to him like Dr. Wynn was not complying with Officer Estes' instructions.

[5] Dr. Wynn does not recall Officer Estes commanding her to place her arms behind her back. Regardless, the parties do not dispute that Dr. Wynn did not voluntarily hold her hands out to be cuffed.

[6] According to Dr. Wynn, this contact dredge up memories of an assault which occurred when she was a young girl.

During this period, Sgt. Young spoke with a hospital supervisor, Jennifer Waybright, who had come outside to see what was happening. When Sgt. Young asked Ms. Waybright if another obstetrician could be summoned and, if so, how long it would take for that doctor to arrive, she responded that it would take approximately 30 minutes.[7] Sgt. Young told Ms. Waybright to call that doctor because Dr. Wynn was headed to jail.

Dr. Wynn was transported to ths sheriff's office where she arrived at 9:41 p.m., and the handcuffs were removed. Officer Estes began preparing a criminal summons against Dr. Wynn for speeding, felony evading arrest, resisting arrest, no insurance, a vehicle registration violation, and a driver's license violation. While doing so, he received a phone call from John Dickey, the Chief of Police, who instructed him that Dr. Wynn was to be released from custody immediately so that she could return to the hospital to deliver the baby. Dr. Wynn was released on her own recognizance, some thirty minutes to an hour after arriving at the sheriff's office.[8]

As a result of the incident, Officer Estes was suspended from the police force for one month, and placed on administrative leave for an additional thirty days. Sgt. Young was suspended for seven days. In disciplining the officers, Chief Dickey determined that, "it seems to be readily apparent that neither Officer Estes nor Sergeant Young used their better judgment when evaluating the circumstances as it relates to the actions of Dr. Wynn versus the immediate need of medical attention for her patient." (Docket No. 49, Ex. 4).

The speeding charge, which was the only charge actually filed, was later cancelled by motion

---

[7] In her deposition, Ms. Waybright stated that emergency room physicians were at the hospital and were trained and available to perform deliveries.

[8] Dr. Wynn claims that, after receiving the call, Officer Estes began taking his time filling out the paperwork, thereby extending the time that she was at the station.

of the district attorney. Dr. Wynn did not seek any medical treatment for the injuries sustained during the incident, and any lingering pain is said to be "very minimal."

Based upon the foregoing events, Dr. Wynn filed suit in this Court alleging both federal and state law causes of action. She brings federal claims under 42 U.S.C. § 1983, alleging that her Fourth and Fourteenth Amendment rights were violated, and those claims are brought against Officer Estes and Sgt. Young in both their individual and official capacity, against Sgt. Young in his supervisor capacity, and against the City of Pulaski under a theory of municiplal liability. She also brings state law claims for battery, false imprisonment, malicious prosecution, abuse of process, and outrageous conduct.

## II. STANDARD OF REVIEW

The standards governing summary judgment motions are well known. A party may obtain summary judgment if the evidence establishes there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in his or her favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## III. APPLICATION OF LAW

As indicated, motions for summary judgment have been filed by all Defendants, and the Court will consider the motions in turn. Prior to doing so, and to avoid unnecessary redundancy, however, the Court addresses several matters that are common to all three motions.

## A. **Fourteenth Amendment Equal Protection Claim**[9]

The Fourteenth Amendment's Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV, § 1.[10] Under the Equal Protection Clause, "the states cannot make distinctions [that] ... burden a fundamental right, target a suspect class, or intentionally treat one differently from others similarly situated without any rational basis for the difference." Radvansky v. City of Olmsted Falls, 395 F.3d 291, 312 (6th Cir. 2005). Moreover, the Equal Protection Clause "prohibits selective enforcement of the law based on considerations such as race." Whren v. United States, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).

In support of her equal protection claim, Dr. Wynn points to her deposition testimony, wherein she testified that she "found out later" that Officer Estes "stopped me because I am African-American, because I was driving an out of state tag [sic], and he figured I was somebody he could hassle." (Doc. No. 53-5, Pf. Depo at 159). She further testified that this became "pretty obvious" once she "learned his background," to wit, "that he was involved in a racial lawsuit," he had "a strong background of treating people unfairly," and people said "he's very racist[.]" (Id. at 158-160). Dr. Wynn acknowledges in her reply brief, however, that "[t]his testimony would be easier to dismiss if it were not for the crucial fact that it has been corroborated by Ms. [Vivian] Sims who states that at least one City of Pulaski . . . authority admitted that Dr. Wynn was pulled over because of her race and even

---

[9] In addition to her equal protection clause claim, Dr. Wynn also brought substantive and procedural due process claims under the Fourteenth Amendment, but concedes dismissal of those claims is appropriate. (Docket No. 80 at 15 n. 3).

[10] "[B]ecause the Equal Protection Clause provides protection from constitutionally unequal treatment independent of the Fourth Amendment's protection against unreasonable searches and seizures, the existence of probable cause . . . does not perforce dispose of [plaintiff's] Fourteenth Amendment claim." Cunningham v. Sisk, 136 Fed. Appx. 771, 774 (6th Cir. 2005).

sought to apologize to Dr. Wynn on behalf of the City." (Docket No. 80 at 16).

So far as relevant, Ms. Sims states in her affidavit:

7. I was informed by the Mayor that he had learned directly from the police officer that the reason that Dr. Wynn was pulled over on that date was because they saw that she was an African American female, driving fast, in a red car with an out-of-state license plate.

8. I was informed by the Mayor that upon being pulled over, Dr. Wynn told the police officers that she was driving fast because she was on her way to make a delivery.

9. The Mayor stated that the police officer said that he assumed that she was on her way to deliver pizza or drugs.

(Docket No. 82-3 ¶¶ 7-9).

Problems with Ms. Sims' affidavit abound, even assuming that "the police officer" is Officer Estes. Not only was she not disclosed as a witness as required by Fed. R. Civ. P. 26(a)(1) and 26(e), her affidavit is almost entirely hearsay, at points is triple hearsay and, with respect to the just quoted portions, is double hearsay.

Of course there are exceptions to the hearsay rule, and Dr. Wynn seeks to utilize the affidavit because the statements alleged to have been made (that, incidentally, the Mayor flatly denies) are supposedly an "admission against interest." (Docket No. 105 at 2). She cites no rule for that proposition, but to the extent she may be relying upon the "statement against interest" provision found in Fed. R. Evid. 804(b)(3), such reliance is misplaced because "[u]navailability of the declarant is a prerequisite to the exception from the hearsay rule of an admission against interest, Fed. R. Evid. 804(a)," Grace United Methodist Chruch v. City of Cheyenne, 451 F.3d 643, 665 (10th Cir. 2006), and Dr. Wynn has made no showing of unavailability in this case. To the extent Dr. Wynn claims the alleged statements somehow fit into the "opposing party's statement" provisions of Fed. R. Evid. 801 (d)(2), it is incumbent upon her to establish that "each part of the combined statements conforms to an exception to the [hearsay] rule." Fed. R. Evid. 805; see, Essex Ins. Co. v. Fidelity & Guar. Ins.

Underwriters, Inc., 282 Fed. Appx. 406, 412 (6th Cir. 2008) ("because [plaintiff] wants to use the transcript as substantive evidence for the truth of the matters . . . asserted, not merely to establish that he said those words, . . . the transcript is hearsay within hearsay, and therefore needs an exception to cover both layers to be admissible"). Dr. Wynn has not shown that Ms. Sims' clearly hearsay statements meet an exception to the hearsay rule, and, in fact, it is unclear from the affidavit who Ms. Sims is, or what role, if any, she has with the City of Pulaski. Accordingly, the Court does not rely upon her affidavit for Dr. Wynn's Fourteenth Amendment claim, or any of her other claims.

Hearsay aside, to prevail on an equal protection claim under the Fourteenth Amendment, whether it be a claim of selective enforcement, or a claim of differing treatment, a plaintiff must show that those outside the protected class were treated differently. See, Bench Billboard Co. v. City of Cincinnati, 675 F.3d 974, 986 (6th Cir. 2012) (citation omitted) ("'To succeed on a 'class of one' equal protection claim, [a p]laintiff must first prove that it has been treated differently from similarly situated individuals'"); Daubenmire v. City of Columbus, 507 F.3d 383, 390 (6th Cir. 2007) ("To prove the first element [of a selective enforcement claim], Plaintiffs must show that similarly situated persons outside their category were not prosecuted"). "'Furthermore, there is a strong presumption that the state actors have properly discharged their official duties, and to overcome that presumption the plaintiff must present clear evidence to the contrary; 'the standard is a demanding one.'" Daubenmire, 507 F.3d at 390 (quoting, Stemler v. City of Florence, 126 F.3d 856, 873 (6th Cir. 1997)).

Dr. Wynn has presented no evidence, let alone clear evidence that others similarly situated (*i.e.* speeders) were treated differently than her. As such, and because her equal protection claim is based upon nothing but hearsay to which no exception has been shown to apply, summary judgment will be granted on her claims under the Fourteenth Amendment.

**B. <u>Qualified Immunity Framework</u>**

Apart from the Fourteenth Amendment, Dr. Wynn brings Fourth Amendment claims for false arrest and excessive force. Defendants assert that the individual Defendants are entitled to qualified immunity on those claims.

Qualified immunity is an affirmative defense which shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate 'clearly established' statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Generally, the qualified immunity inquiry involves first determining whether a constitutional violation occurred, and, if so, a subsequent determination of whether the right infringed was clearly established. Saucier v. Katz, 533 U.S. 194, 202 (2001); McKinley v. City of Mansfield, 404 F.3d 418, 429-30 (6th Cir. 2005).[11]

For a right to be "clearly established," it need not be specifically announced by the Supreme Court or the Sixth Circuit. As the Sixth Circuit has explained:

> "For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Leonard v. Robinson, 477 F.3d 347, 355 (6th Cir. 2007) (citation and internal quotation marks omitted). "A right is clearly established if there is binding precedent from the Supreme Court, the Sixth Circuit, the district court itself, or other circuits that is directly on point." Risbridger v. Connelly, 275 F.3d 565, 569 (6th Cir. 2002) (citation omitted). However, "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent." Wilson v. Layne, 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). . . . A public official could "still be on notice that [his] conduct violates established law even in novel factual circumstances." Hope v. Pelzer, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).

---

[11]While this sequence "is often appropriate, it should no longer be regarded as mandatory." Pearson v. Callahan, 129 S.Ct. 808, 818 (2009). Instead, courts should use "their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Id.

Holzemer v. City of Memphis, 621 F.3d 512, 527 (6ᵗʰ Cir. 2010).

The Court utilizes this framework in addressing Dr. Wynn's remaining constitutional claims.

## C. **Handcuffing Claim**

Plaintiff seeks to hold both of the individual Defendants liable on a claim of excessive force because, allegedly, the handcuffs placed on her by Officer Estes after the arrest were too tight.

"The Fourth Amendment prohibits unduly tight or excessively forceful handcuffing during the course of a seizure." Miller v. Sanilac County, 606 F.3d 240, 252 (6ᵗʰ 2010). However, "[n]ot all allegations of tight handcuffing . . . amount to excessive force," Lyons v. City of Xenia, 417 F.3d 565, 575 (6ᵗʰ Cir. 2005), and "[t]o survive summary judgment, a plaintiff must create a genuine issue of material fact that: '(1) he or she complained that the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced  some physical injury resulting from the handcuffing.'" Stricker v. Twp of Cambridge, ___ F.3d ___, ___, 2013 WL 141695 at *11 (6ᵗʰ Cir. Jan. 14, 2013) (quoting, Miller, 606 F.3d at 252).

In this case, Dr. Wynn's handcuffing claim fails as to Officer Estes because she points to no evidence which indicates that she complained to him about the handcuffs being too tight.  Quite the contrary, in her statement of undisputed facts and based upon her own deposition testimony, she asserts that "[w]hen she was sitting in the back of Officer Estes' squad car, Dr. Wynn complained that the handcuffs were too tight *to Sergeant Young*, who ignored the complaint."  (Docket No. 85 at 5 ¶ 13) (emphasis added).

As for her handcuffing claim against Sgt. Young, Dr. Wynn testified in her deposition that she "said something about the cuffs," or "said something about the cuffs being too tight." (Docket No. 53-7, Pf. Depo. at 186 & 224).  In light of Dr. Wynn's subsequent refusal of treatment at the station house, this may be insufficient as a matter of law to hold Sgt. Young liable in the absence

11

of noticeable injury or discomfort, or a request to loosen the cuffs.  See, O'Malley v. City of Flint, 652 F.3d 662, 672 (6th Cir. 2011); Lyons, 417 F.3d at 576.  Regardless, Sgt. Young knew that Dr. Wynn was being taken to the sheriff's office and that this was a trip that would (and did) take about ten minutes.

The present factual scenario is not unlike that addressed in Fettes v. Hendershot, 375 Fed. Appx. 528 (6th Cir. 2010) .  There, plaintiff Fettes was alleged to have  complained that the handcuffs "were much too tight and that they were hurting [him]," but the officer told him "not to worry" about it because he faced only a ten minute ride to the jail.  In addressing the question of "'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted,'" as required by Saucier, 533 U.S. at 202, the Sixth Circuit wrote:

> After careful consideration of the record and our precedent, we answer this question in the negative. To deny the officers qualified immunity, we must deem their use of force under the circumstances objectively unreasonable. . . . We find the opposite: a reasonable officer would not know that the failure to respond to a complaint about tight handcuffs during a ten-minute ride to the police station violates the Constitution.

> Our precedents fail to notify officers that any response to a complaint of tight handcuffing other than an immediate one constitutes excessive force.  Indeed, a constitutional requirement obligating officers to stop and investigate each and every utterance of discomfort and make a new judgment as to whether the handcuffs are "too tight" is neither reasonable nor clearly established. Here, the short duration of the trip, adherence to police handcuff protocol, and absence of any egregious, abusive, or malicious conduct supports the reasonableness of the officers' conduct. Moreover, unlike other cases in which we have denied qualified immunity, the officers here acted without malice and with reason-they declined to loosen the handcuffs in light of the short, ten-minute transport to the police station.

> At the very worst, the decision not to pull over the vehicle and readjust Fettes's handcuffs during the ten-minute trip to the station falls in the "hazy border between excessive and acceptable force" along which qualified immunity operates to shield officers from discretionary, on-the-spot judgments.

Fettes, 375 Fed. Appx. at 533 (citations omitted).

If the law was not clearly established on April 27, 2010 when <u>Fettes</u> was decided, it not any more clearly established when the incident occurred in this case barely more than a week later. In fact, qualified immunity is likely even more appropriate in this case because Dr. Wynn's complaints to Sgt. Young hardly rose to the level of the complaint aired by Fettes, but ignored by the officer. <u>See</u>, <u>Morrison v. Bd. of Trustees of Green Twp.</u>, 583 F.3d 394, 404 (6th Cir. 2009) (where alleged injuries from handcuffing do not suggest "an obvious physical problem that a reasonable office would have been aware of them," plaintiff must "strictly satisfy the first two elements of the test"). Accordingly, summary judgment will be granted on the handcuffing claim.

## D.  <u>Officer Estes' Motion for Summary Judgment</u>

### 1.  **Fourth Amendment Claims**

In addition to her handcuffing claim, Dr. Wynn contends that her constitutional rights were violated when she was initially stopped, subsequently arrested, and when she was subjected to excessive force.

"The Fourth Amendment's guarantee that people shall 'be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures' has been part of our Constitution since 1791," and "[a]s a general proposition, the law that a search or seizure must be objectively 'reasonable' under all the circumstances has been 'clearly established' for a long time." <u>Holland ex rel. Overdorff v. Harrington</u>, 268 F.3d 1179, 1195-96 (10th Cir. 2001).

Dr. Wynn's contention that the initial traffic stop was invalid is easily resolved against her in light of the Court's conclusion that she has forwarded insufficient evidence to show that race was the sole motivating factor in the stop. Under the Fourth Amendment, "[a]n officer may lawfully stop a motorist who he has probable cause to believe has committed a traffic violation," <u>United States v. Davis</u>, 2012 WL 5200368 at *1 (6th Cir. 2012), and "speeding . . . alone is enough to render the

stop lawful under the Fourth Amendment at its initiation." United States v. Everett, 601 F.3d 484, 488 (6th Cir. 2010).

Here, Officer Estes asserts that Dr. Wynn was stopped because she was clocked going 46 miles an hour in a 30 mile-per-hour zone, and Dr. Wynn has no evidence to dispute that assertion. In fact, she stated in her deposition that she did not look down at her speedometer while en route to the hospital, but believes she was going 40 miles-per-hour, itself a speeding violation.

The conclusion that the initial traffic stop did not violate the Fourth Amendment does not mean that Dr. Wynn's subsequent arrest was lawful as well because, to be valid, it must have been based upon probable cause to believe that she committed an arrestable offense.

"[T]he federal right to be subject only to arrest upon probable cause [i]s clearly established." Everson v. Leis, 556 F.3d 484, 500 (6th Cir. 2009). "Probable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232 (1983). The determination of whether probable cause exists is based upon the "totality of the circumstances," id. at 238, with the critical question being "whether at the time of the arrest, 'the facts and circumstances within the [arresting officer's] knowledge and of which he had reasonably trustworthy information were sufficient to warrant a prudent person to conclude that an individual had either committed or was committing an offense.'" United States v. Torres-Ramos, 536 F.3d 542, 555 (6th Cir. 2008) (quoting, Beck v. Ohio, 379 U.S. 91 (1964)).

"'When no material dispute of fact exists, probable cause determinations are legal determinations that should be made' by the court." Alman v. Reed, 2013 WL 64370 at *6 (6th Cir. Jan. 7, 2013)(quoting, Hale v. Kart, 396 F.3d 721, 728 (6th Cir. 2005)). "But '[i]f disputed factual issues underlying probable cause exist, those issues must be submitted to a jury for the jury to

determine the appropriate facts.'"  Id.

Here, there unquestionably are factual disputes as to whether Dr. Wynn was arrested based upon probable cause.  Officer Estes argues that Dr. "Wynn was not, as she alleges, arrested primarily for speeding but rather primarily for intentionally fleeing a police officer, a felony under T.C.A. § 39-16-603(b)(1)."  (Docket No. 95 at 4).  Even so, whether Dr. Wynn fled is a question for the jury because she claims that she made it unmistakably clear to the officer that she was going to the hospital to deliver a baby, she understood that the officer was following her to the hospital and providing her an escort, she was wearing scrubs and had her lab coat next to her in the car, and she was not arrested until she was at the hospital headed towards the entrance.

Factual disputes also preclude summary judgment on Dr. Wynn's excessive force claim, notwithstanding this Court's conclusion that dismissal of her handcuffing claim is warranted.

In Graham v. Connor, 490 U.S. 386 (1989), the Supreme Court held "that *all* claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach."  Id. at 395 (italics in original).  The Court went on to hold that the reasonableness of a particular use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight[.]"  Id. at 396.  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments . . . about the amount of force that is necessary in a particular situation."  Id.

In making the reasonableness calculation, Graham instructs courts to look at the severity of the crime, whether the subject posed an immediate threat to the safety of the officers or others, and whether the subject was resisting arrest.  Id.  Other factors which may be considered include "the

need for the force, the degree of force applied, [and] the injuries inflicted[.]" <u>Landis v. Baker</u>, 297 Fed. Appx. 453, 462 (6th Cir. 2008).

Applying the relevant factors in this case, a jury question is presented in regard to the excessive force claim against Officer Estes. Fleeing in a motor vehicle can be considered as a relatively serious crime, particularly since it could put pursing officers and others at risk. But this assumes as a given that Dr. Wynn was actually fleeing, something she disputes. If a jury believes Dr. Wynn, it might be inclined to also believe that she did not pose an immediate threat to the officers at the time she was arrested, particularly since Officer Estes outweighed her by 100 pounds and he claims to be able to bench press 400 pounds. Further, when the facts are construed in Dr. Wynn's favor, she claims that she was not actively resisting arrest, notwithstanding that she did not put out her hands to be cuffed or willingly get into the car. Further, while she suffered relatively minor injuries during her arrest, there is a question of fact as to whether there was the need for the force applied that (according to Dr. Wynn) included being slammed up against the cruiser and being pinned there for up to several minutes. In short, a reasonable jury could conclude that, at the moment of arrest outside the hospital, a reasonable police officer would have concluded that a person who told him she was going to the hospital to deliver a baby, who proceeded to the hospital, who parked in the physicians' parking lot, and who presented medical documents was a medical professional, and that reasonably effecting an arrest of that individual would not require slamming her on the hood of a patrol car and holding her there for an unnecessary length of time. Because of the factual disputes, and because "there is no doubt that <u>Graham v. Connor</u> . . . clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness," <u>Saucier</u>, 121 S.Ct. at 2156, summary judgment will be denied on Dr. Wynn's excessive force claim against Officer Estes.

16

### 2. State Law Claims

#### a. Battery

The parties agree that, under the Sixth Circuit's interpretation of Tennessee law, a state law claim for battery arising out of the same use of force as an "excessive use of force" claim under 42 U.S.C. § 1983 are analyzed identically. See, Griffin v. Hardrick, 604 F.3d 949, 956-57 (6th Cir. 2010). Since the Court denies summary judgment on Dr. Wynn's excessive force claim, summary judgment is denied on her state law battery claim against Officer Estes as well.

#### b. False Imprisonment

"The elements of the tort of false imprisonment are (1) the detention or restraint of one against his will and (2) the unlawfulness of such detention or restraint." Roberts v. Essex Microtel Assoc., II, L.P., 46 S.W.3d 205, 213 (Tenn. Ct. App. 2000). Relying upon Brown v. SCOA Indus. Inc., 741 S.W.2d 916, 919-20 (Tenn. Ct. App. 1987) for the proposition that "'[f]alse imprisonment is the intentional restraint or detention of another without just cause,'" and that "'[l]ike the tort of malicious prosecution, false imprisonment requires that the defendant must have acted without probable cause,'" Officer Estes moves for summary judgment because he "had probable cause to arrest the Plaintiff[.]" (Docket No. 57 at 36-37). However, this Court has determined that there exist genuine issues of material fact as to whether there was probable cause to arrest Dr. Wynn and accordingly summary judgment on this claim is also unwarranted.

#### c. Malicious Prosecution

"In order to establish the essential elements of an action for malicious prosecution, the plaintiff must show that (1) a prior suit or judicial proceeding was brought against plaintiff without probable cause, (2) defendant brought such prior action with malice, and (3) the prior action was finally terminated in favor of plaintiff." Christian v. Lapidus, 833 S.W.2d 71, 73 (Tenn. 1992).

"With respect to the last of these requirements, a judgment that terminates a lawsuit in favor of one of the parties must address the merits of the suit rather than terminating the suit on procedural or technical grounds." Himmelfarb v. Allain 380 S.W.3d 35, 38 (Tenn. 2012).

In opposing summary judgment on the malicious prosecution claim, Dr. Wynn argues that "although officer Estes intended to prosecute [her] for resisting arrest and evading arrest, he ultimately only completed one Criminal Summons, for speeding," that " was 'canceled' on May 19, 2010, following a May 11, 2010, motion from the District Attorney General." (Docket No. 80 at 18-19). Dr. Wynn does not explain how a decision to "cancel" a ticket by the prosecutor can be a decision on the merits, while a decision to take a nonsuit is a not, see, Himmelfarb, 380 S.W.3d at 38, and a voluntary dismissal where there has been no proof submitted to either support or deny the charge also is not. See, Lane v. Becker 334 S.W.3d 756, 762 (Tenn. Ct. App. 2010). Accordingly, summary judgment will be granted on Dr. Wynn's malicious prosecution claim.

### d. Abuse of Process

In response to Officer Estes' Motion for Summary Judgment, Dr. Wynn concedes that insufficient evidence has been adduced to establish her abuse of process claim. Accordingly, summary judgment will be granted on this claim

### e. Outrageous conduct

The tort of outrageous conduct, also know as the intentional infliction of emotional distress, has three elements: "(1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct complained of must result in serious mental injury." Bain v. Wells, 936 S.W.2d 618, 622 (Tenn. 1997).

Here, even assuming that Officer Estes' conduct was reckless if not intentional, assuming for the sake of argument that Dr. Wynn "has the legal authority to make formal medical diagnoses"

and "testified – without opposition – the she suffered severe emotional distress" (Docket No. 80 at 20), and further assuming that said testimony could lead a reasonable jury to conclude that her "'distress is so severe that no reasonable [person] could be expected to endure it,'" <u>Betty Saint Rogers v. Louisville Land Co.</u> 2011 WL 2112766, 3 (Tenn. Ct. App.) (Tenn. Ct. App. 2011) (citations omitted), this claim fails because Dr. Wynn has not shown conduct which can be characterized as "outrageous." All she argues is that the outrageousness of the conduct is "demonstrated by the fact that Officer Estes was suspended from the police force for one month and placed on administrative leave for an additional 30 days." (Docket No. 80 at 20).

"Liability [for intentional infliction of emotional distress] has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." <u>Bain</u>, 936 S.W.2d at 622. "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous.'" <u>Id</u>. at 623.

Obviously, the fact that Officer Estes was suspended hardly establishes "atrocious and utterly intolerable conduct," as employees are suspended all the time. Looking at what he is alleged to have done even under Dr. Wynn's account of the events, and considering that she has failed to produce competent evidence that the traffic stop was based solely on her race, the Court finds, as a matter of law, insufficient evidence to submit her outrageous conduct claim to the jury. <u>See</u>, <u>Watkins v. City of Southfield</u>, 221 F.3d 883, 890 (6th Cir. 2000) (while alleged use of racial epithet gave appeals court "some pause," summary judgment appropriate on high school student's outrageous conduct claim against police officers, notwithstanding his contentions that "he was harassed, intimidated and verbally assaulted by defendants when they tried to 'ram' him from behind

and then forced him off the road," he was ordered from the car at gunpoint, and his head was smacked up against the car); <u>VanRooyen v. Wipro Gallagher Solutions, Inc.</u>, 2010 WL 3063672 at *10 (M.D. Tenn. July 30, 2010) (collecting cases finding outrageous conduct, including "mother being shown her deceased baby preserved in formaldehyde in a jar"; "mother being erroneously informed her daughter's death was the result of sexual assault and suffocation"; and "photo store employee informing a woman that her film could not be developed when in fact the employee developed the film, kept the nude photographs, and showed them to acquaintances of the customer"); <u>Lourcey v. Estate of Scarlett</u>, 146 S.W.3d 48, 52 (Tenn. 2004) (evidence which showed defendant told plaintiff his wife was having a seizure and, as plaintiff was calling 911 for help, defendant shot his wife in the head, turned to face the plaintiff, put a pistol to his head, pulled the trigger, and killed himself was sufficient to support an intentional infliction of emotional distress claim because conduct "was outrageous in character, extreme in degree, beyond all possible bounds of decency, and utterly intolerable in a civilized society.").

**E.  <u>Sergeant Young's Motion for Summary Judgment</u>**

Except for being told "something" about the handcuffs, or being told they were "too tight," Sgt. Young was not personally responsible for any of the purported misconduct.  Nevertheless, Dr. Wynn seeks to hold him liable on her federal claims under a theory of supervisory liability.

For supervisory liability to attach, "it is not enough for the plaintiff to show that the defendant supervisors were sloppy, reckless or negligent in the performance of their duties." <u>Doe ex rel.</u> <u>Doe v. City of Roseville</u>, 296 F.3d 431, 439 (6th Cir. 2002).  Rather, "the plaintiff must show that the 'defendants' conduct amounted to a tacit authorization of the abuse.'" <u>Id</u>. (citation omitted).

Dr. Wynn argues that, while Sgt. Wynn claims to believe he did not have the authority to

countermand Officer Estes' arrest of Dr. Wynn, the police department's "Description of Police Sergeant" states that a "sergeant's duties include 'supervision of an officer in a lower classification[.]'" (Docket No. 81 at 4). Dr. Wynn reads this to mean that Sgt. Young "had the authority to release [her] at the hospital so that she could treat her patient and deliver the patient's baby." Id.

Merely offering a job description for a supervisor, and arguing about its "ordinary English mean[ing]," is insufficient to prevail on summary judgment. This is because "[a] theory of supervisory liability requires a civil rights plaintiff to demonstrate more than a supervisor's mere passivity in the face of a subordinate's alleged unconstitutional action.'" Rodriguez v. City of Cleveland, 439 Fed. Appx. 433, 457 (6th Cir. 2011). "Indeed, 'liability under § 1983 must be based on active unconstitutional behavior and cannot be based upon a mere failure to act,' . . . or the 'mere right to control employees.'" Id. at 457-58 (internal citations omitted). Besides, simply failing to follow a policy directive is insufficient to establish liability because "[u]nder Section 1983, the issue is whether [Sgt. Young] violated the Constitution, not whether he should be disciplined by the local police force." Smith v. Freeland, 954 F.2d 343, 347 (6th Cir. 1992); see. Laney v. Farley, 501 F.3d 577, 581 n. 2 (6th Cir. 2007) ("a § 1983 claim may not be based upon a violation of state procedure that does not violate federal law").

As for her state law claims against Sgt. Young, she concedes that he is not liable for the tort of abuse of process, but makes no arguments about her other claims, other than to rest upon the arguments she raised in response to Officer Estes' Motion for Summary Judgment. Obviously the two Defendants are not similarly situated, as Officer Estes is the one who allegedly did the wrongful acts. Dr. Wynn has simply failed to forward sufficient evidence to present a jury issue on her claims against Sgt. Young for false imprisonment, abuse of process, or outrageous conduct.

**F. City of Pulaski's and John Doe's Motion for Summary Judgment**

As a preliminary matter, Dr. Wynn does not object to dismissal of the John Doe Defendants (Docket No. 83 at 3), and so the Court focuses solely on her claims against the City of Pulaski.

**1. Federal Claims**

The City of Pulaski first argues it is entitled to summary judgment because Plaintiff has no viable constitutional claims against the individual Defendants. However, the Court has found that triable issues exist on Dr. Wynn's unlawful arrest and excessive force claims against Officer Estes. Notwithstanding Officer Estes' allegedly wrongful acts, however, the City of Pulaski is entitled to summary judgment.

In <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 691 (1978) the Supreme Court held that "a municipality cannot be held liable solely because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." However, "municipalities may be held liable under § 1983 when the injury inflicted is a result of 'a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" <u>Radavansky v. City of Olmstead Falls</u>, 395 F.3d 291, 311 (6th Cir. 2005) (quoting, <u>Monnel</u>, 436 U.S. at 694).

In this case, Dr. Wynn argues that the City of Pulaski can be found liable for any of three reasons. First, she claims that the police department has established a "quota" requiring "each officer to accomplish 10 'traffic or custodial arrests' per month as a work performance goal." (Docket No. 83 at 5). Dr. Wynn's sole support for her "quota" claim is Officer Estes' and Sgt. Young's deposition testimony that they were "expected" to make ten arrests per month. This hardly suggest a hard-and-fast policy of the department or the City of Pulaski, but, even if it did, municipal liability cannot attach in the absence of showing some link between the quota and the allegedly false

arrest of, and use of excessive force on, Dr. Wynn.  See, Jones v. City of Elkhart, 2012 WL 5947707 at *13 (N.D. Ind. Nov. 28, 2012) (collecting cases for the proposition that, to survive summary judgment, plaintiff was required to present "evidence showing a direct link between minimum traffic citation requirements and the events" in question).  Because "'municipalities face policy-based liability under § 1983 only if a plaintiff demonstrates 'that, through its deliberate conduct, the municipality was the moving force behind the injury alleged'" Siler v. Webber, 443 Fed. Appx. 50, 53 (6th Cir. 2011) (quoting, Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997), the City of Pulaski is entitled to summary judgment on Dr. Wynn's quota allegations.

Second, Dr. Wynn argues the City of Pulaski is liable under a failure to train theory.  In this regard, she points to two Tennessee statutes that purport to exempt doctors responding to an emergency from compliance with posted speed limits.

The statutes upon which Dr. Wynn relies – Tenn. Code Ann. § 55-8-108 and § 55-4-202 – hardly support her position that she was entitled to speed, or, more pertinently, that had Officer Estes and Sgt. Young received training on these statutes, the events about which she claims would not have occurred.  The former speaks about individuals operating emergency vehicles, and allows the operator to speed, but only "when the vehicle is making use of audible and visual signals meeting the requirements of the applicable laws of this state."  Tenn. Code Ann. § 55-8-108(b)(1)(c) & (d)(1).  Even assuming the highly doubtful proposition that a private vehicle's emergency flashers are the "visual signals" contemplated by the statute, Dr. Wynn was not driving an "authorized emergency vehicle."  As for the latter, that statute lists 18 categories of specialty license plates, including "emergency" plates, and requires that each category have a distinctive design.  But Plaintiff's vehicle bore no Tennessee tags, let alone an "emergency" specialty plate.

The apparent inapplicability of the statutes aside, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." Connick v. Thompson, 131 S.Ct. 1350, 1359 (2011). "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." City of Canton v. Harris, 489 U.S. 378, 390-91 (1989). "In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." Id. at 392. Therefore, and because any "lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983," id. at 391, "a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" Connick, 131 U.S. 1359 (citation omitted). With regard to deliberate indifference, the Supreme Court in Connick explained:

> "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." . . . Thus, when city policymakers are on *actual or constructive notice that a particular omission in their training program* causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. . . . The city's "policy of inaction" in light of notice that its program will cause constitutional violations "is the functional equivalent of a decision by the city itself to violate the Constitution."

Id. at 136 (emphasis added, internal citations omitted); See, Fisher v. Harden, 398 F.3d 837, 849 (6th Cir. 2005) (citation omitted) ("To establish deliberate indifference, the plaintiff 'must show prior instances of unconstitutional conduct demonstrating that the County has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.'").

Dr. Wynn has pointed to absolutely no evidence which would suggest that the City of Pulaski had either actual or constructive knowledge that any lack of training regarding authorized emergency vehicles or vehicles bearing "emergency" plates has resulted in the deprivation of anyone's constitutional rights.[12]

Third and finally, Dr. Wynn argues that the City of Pulaski can be held liable because it retained Officer Estes, notwithstanding the fact that he had been sued some eighteen months earlier for allegedly assaulting an African American youth at a McDonald's restaurant. Although Judge Trauger denied qualified immunity on several of the claims against Officer Estes in that case, Hollis v. Estes, 2011 WL 336146 (M.D. Tenn. January 31, 2011), there was no finding or concession of liability, and the case subsequently settled. Regardless, "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under Monell," Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 (1985), and even "[a] handful of isolated excessive force complaints occurring several years before the relevant conduct do not establish a 'pattern or practice' of condoning such activity." Estate of Hickman v. Moore, 2012 WL 4857037 at *8 (6th Cir. Oct. 15, 2012).

Based on the foregoing, summary judgment will be granted in favor of the City of Pulaski on Dr. Wynn's federal claims.

### 2. State Law Claims

The City of Pulaski argues it is entitled to immunity on Dr. Wynn's state law claims pursuant to the Tennessee Governmental Tort Liability Act ("GTLA"), Tenn. Code Ann. § 29-20-101 *et seq.*

---

[12] Also on the issue of alleged lack of training, Dr. Wynn asserts that, after the incident in this case, City of Pulaski police officers were provided training on "Responding to Allegations of Racial Profiling: Building Trust Between Police and the Community." (Docket No. 83 at 6). This assertion, standing alone, does not suggest that the City of Pulaski had actual or constructive knowledge that its police officers engaged in racial profiling, and this conclusion remains, notwithstanding the fact (as discussed below) that Officer Estes had been sued in the past.

So far as relevant, that statute provides:

> Immunity from suit of all governmental entities is removed for injury proximately caused by a negligent act or omission of any employee within the scope of his employment except if the injury arises out of:
>
>> (1) The exercise or performance or the failure to exercise or perform a discretionary function, whether or not the discretion is abused;
>>
>> (2) False imprisonment pursuant to a mittimus from a court, false arrest, malicious prosecution, intentional trespass, abuse of process, libel, slander, deceit, interference with contract rights, infliction of mental anguish, invasion of right of privacy, or civil rights[.]

Tenn. Code Ann. § 29-20-205.

Although acknowledging the foregoing, Dr. Wynn argues the GTLA "removes  municipal immunity from liability for any tort committed by a municipal employee—including battery—not specifically enumerated in the intentional tort exception set forth at subsection (2)," and that, to the extent this court determines summary judgment is appropriate with regard to any of her state law claims, "then there cannot have been an injury 'aris[ing] out of civil rights,' and immunity is not removed."  (Docket No. 83 at 9).

The Court rejects Dr. Wynn's argument.   Where state law claims are asserted in the context of a civil rights actions and where the "claims against the governmental entities 'clearly arise out of and directly flow from the allegations that the police officers deprived [plaintiff] of [her] civil rights," immunity under the GTLA attaches.  Jackson v. Thomas, 2011 WL 1049804 at *6 (March 23, 2011) (quoting, Bettis v. Pearson, 2007 WL 2426404 at *11 (E.D. Tenn. 2007)).  Thus, where the plaintiff in Jackson filed an action claiming her rights under the Fourth Amendment were violated, the county was entitled to immunity under the GTLA on her false imprisonment, false arrest, abuse of process, invasion of privacy, libel, negligence, negligent and intentional infliction of emotional distress, fraud, and malicious prosecution claims.  Similarly, in Bettis, GTLA immunity

was appropriate on plaintiff's state law claims for false arrest, false imprisonment, aggravated assault, intentional and negligent infliction of emotional distress, and malicious prosecution claims where they were brought as a part of a federal civil rights action. Likewise in this case, the City of Pulaski is entitled to immunity under the GTLA on Dr. Wynn's state law claims because they clearly arose and directly flowfrom her allegation that Defendants violated her civil right..

## IV.  CONCLUSION

Based upon the foregoing, the Motion for Summary Judgment filed by the City of Pulaski and John Doe Defendants # 1 - # 20 will be granted, as will the Motion for Summary Judgment filed by Sgt. Young.  The Motion for Summary Judgment filed by Officer Estes will be denied, except with respect to Dr. Wynn's Fourteenth Amendment claims, her Fourth Amendment claims based upon handcuffing and the initial traffic stop, and her state law claims for malicious prosecution, abuse of process, and outrageous conduct.

An appropriate Order will be entered.

KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE